# EXHIBIT A

March 18, 2019

**VIA CM/ECF**

Honorable Rodney Gilstrap
United States District Court for the Eastern District of Texas
Sam B. Hall, Jr. Federal Building and United States Courthouse
100 East Houston Street
Marshall, TX 75670

    Re:  *Harris Corp. v. Huawei Device USA, Inc. et al.*, No. 2:18-cv-00439-JRG

Dear Judge Gilstrap:

Plaintiff Harris Corporation ("Harris") and Defendants Huawei Device USA, Inc., Huawei Device Co., Ltd., Huawei Technologies USA Inc., Huawei Technologies Co. Ltd., and Huawei Device (Shenzen) Co., Ltd. (collectively "Defendants" or "Huawei") respectfully submit this joint letter pursuant to the Court's Standing Order Regarding Motions under 35 U.S.C. § 101. The parties disagree about whether any claim construction would be needed to inform the Court's analysis as to patentability. The parties' respective positions are set forth below.

| | |
|---|---|
| Dated: March 18, 2019 | Respectfully submitted, |
| /s/ *Corey Johanningmeier* | */s/ Melissa R. Smith* |
| Henry C. Bunsow | James R. Batchelder |
| Denise De Mory | James L. Davis, Jr. |
| Christina Finn | Andrew T. Radsch |
| Robin Curtis | Christopher M. Bonny |
| Corey Johanningmeier | **ROPES & GRAY LLP** |
| Nicolas Mancuso | 1900 University Avenue, 6th Floor |
| **BUNSOW DE MORY LLP** | East Palo Alto, CA 94303-2284 |
| 701 El Camino Real | Telephone: (650) 617-4000 |
| Redwood City, CA 94063 | Facsimile: (650) 617-4090 |
| Telephone: (650) 351-7248 | james.batchelder@ropesgray.com |
| Facsimile: (415) 426-4744 | james.l.davis@ropesgray.com |
| hbunsow@bdiplaw.com | andrew.radsch@ropesgray.com |
| ddemory@bdiplaw.com | christopher.bonny@ropesgray.com |
| cfinn@bdiplaw.com | |
| rcurtis@bdiplaw.com | Jolene L. Wang |
| cjohanningmeier@bdiplaw.com | **ROPES & GRAY LLP** |
| nmancuso@bdiplaw.com | 1211 Avenue of the Americas |
| | New York, NY 10036 |
| S. Calvin Capshaw | (212) 596-9000 |
| State Bar No. 03783900 | (212) 596-9090 |
| Elizabeth L. DeRieux | jolene.wang@ropesgray.com |
| State Bar No. 05770585 | |
| | Melissa R. Smith |

| | |
|---|---|
| **CAPSHAW DERIEUX, LLP**<br>114 E. Commerce Ave.<br>Gladewater, TX 75467<br>Telephone: 903-845-5770<br>Email: ccapshaw@capshawlaw.com<br>Email: ederieux@capshawlaw.com<br><br>*Attorneys for Plaintiff*<br>*Harris Corporation* | Texas State Bar No. 24001351<br>**GILLAM & SMITH LLP**<br>303 S. Washington Avenue<br>Marshall, TX 75670<br>Telephone: (903) 934-8450<br>Facsimile: (903) 934-9257<br>melissa@gillamsmithlaw.com<br><br>*Attorneys for Defendants*<br>*Huawei Device USA, Inc., Huawei Device Co., Ltd., Huawei Technologies USA Inc., Huawei Technologies Co. Ltd. and Huawei Device (Shenzhen) Co., Ltd*. |

I.     **Plaintiff's Position: Claim Construction is Necessary to Inform the Court's Analysis**

Harris Corporation develops communication and information technologies for government and commercial markets in the United States and abroad. Complaint at ¶¶ 10-11. The seven patents asserted in this case provided distinct, important advances in the then-emerging field of secure wireless networking.

Huawei styles its Motion to dismiss as dispositive, and therefore asks the Court to rule that *none* of the 362 claims of the seven asserted patents contain a patent-eligible invention. *See* Mot. at ii (defining "Challenged Claims" as "All claims of the Asserted Patents"). Huawei further asks the Court to take this extraordinary step on the pleadings, ignoring that the proper section 101 analysis is often a highly factual inquiry, as here. *See, e.g.*, *Berkheimer v. HP, Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) ("Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination"). Worse still, Huawei implausibly suggests that all of this can be done with no claim construction of *any* claim term among those 362 Challenged Claims.

Huawei's Motion and its position here simply cannot be squared with the Court's guidance that "a definitive ruling on eligibility before claim construction is only warranted in narrow circumstances, making such a ruling the exception rather than the rule." *Phoenix Licensing, LLC v. CenturyLink, Inc.*, Case No. 2:14-cv-965-JRG-RSP, 2015 WL 5786582, at *2 (E.D. Tex. Sept. 30, 2015). Due to the extraordinary scope of the Motion, and Huawei's failure to identify *any* terms it seeks to construe, Harris cannot predict and explain every potential construction dispute here. But as the examples below indicate, the Court cannot simply accept that "Defendants' characterization of the claims and implicit positions on the meaning of claim terms are correct without a meaningful ability to examine fully what a person of ordinary skill in the art would interpret those terms to mean." *Id.* at * 3. Harris' Opposition will further refute Huawei's conclusory assertions of conventionality here and in its Motion.

'227 Patent: "determining the security posture" or "after a [security / vulnerability] posture of the network has been established." This patent was developed with support from the Air Force (see '227 at 1:6-9) and advanced the art of determining security risks in networks by, for example, teaching how to integrate multiple different tools and modes of analysis. *See, e.g.*, '227 at Figs. 3-6, 3:11-16, 7:55-58 ("The data results are correlated to determine a security posture of the network"), 11:1-4, 16:10-26 (claim 1: "correlating a system object model database that supports information data requirements of disparate network vulnerability analysis programs with any data results obtained from the programs"); *see also* Complaint at ¶ 13. Huawei wrongly disparages this patent as being about the display of colors. Mot. at 11. Understanding the meaning of the "security posture" terms, in context of the intrinsic teaching of how to correlate disparate inputs, will assist the Court in rejecting Huawei's reductionist mischaracterizations. Other terms, such as "vulnerability profile," are not even discussed in Huawei's motion, but have specific meanings in context that may well be disputed. *See, e.g.*, '227 at Fig. 8B, 6:40-43.

'690 and '678 Patents:  These two wireless network security patents teach and claim innovative and unconventional ways of detecting rogue devices that gain access to an authorized address and/or ID. *See, e.g.*, '690 and '678 at 2:23-34. Huawei's Motion makes the dubious

claim that all 152 claims are the same for purposes of patent eligibility—then in a single footnote writes off a list of important claim elements from every claim.  Mot. at 6-7.  But many of these inventive aspects are not understandable on their face absent the context of explanations and definitions in the specification.  For example, the meaning of the term "detect collisions of packets" is discussed in the '690 patent at Fig. 19, 8:41-53.  *See also* '690 at Fig. 20, 10:34-43 (discussing "collisions of a same MAC address"); '678 at Fig. 4 & 14, 7:21-45, 9:36-50 (discussing how to "detect contention-free mode operation outside of a CFP"); *id.* at Fig. 3 & 13, 7:3-20, 11:54-65 (explaining the usefulness, and claiming detection, of an "illegal NAV value"); *id.* at Fig. 2 & 12, 6:45-60, 9:13-23 (how to "detect failed attempts to authenticate MAC addresses").  Harris disagrees that all of these claim term meanings could be understood without construction—or that their construction is immaterial to deciding patentability.

'986 patent:  This patent was originally developed with support from the Naval Research Laboratory ('986 at 1:12-15) and advanced the art of scheduling in wireless "ad hoc" networks.  New scheduling methods were invented to respond to varying demands on such communications links.  *Id.* at 2:16-34.  The claims contain terms that correspond to inventive concepts, and that are explained and/or defined by detailed teachings in the specification.  For example, the meaning of, and how to assign, "demand assigned time slots" and "semi-permanent time slots" is discussed in the '986 patent including at Figs. 14-16 and accompanying descriptions, 14:1-16:8, 38:18-22.  These and other disclosures teach (and claim) how to employ various "link utilization metrics" to perform ad hoc scheduling on the networks.  *See, e.g.*, *id.* at 2:35-67.  Huawei strains credibility by suggesting that no such terms will be disputed, or that the Court can decide patentability without further understanding the terms via the construction process.

'537 patent:  This patent details innovations in the clustering of nodes in ad hoc wireless networks as the network changes.  Complaint at ¶ 17.  Terms requiring construction to inform any patentability analysis may include: "unit status message" '537 at Fig. 9, 5:34-38, 8:6-18, 7:37-42, 8:60-66, 11:55-59.

'426 patent:  This patent details innovations in establishing new routes in ad hoc wireless networks.  Complaint at ¶ 19.  Terms requiring construction to inform any patentability analysis may include: "electrically separate channels" '426 at Fig. 8, 1:13-16, 2:40-43, 4:56-6:13.

'572 patent:  This patent details innovations in encrypting secure wireless networking traffic.  Complaint at ¶ 25.  Terms requiring construction to inform any patentability analysis may include: "plurality of encrypting bits" '572 at Fig. 8, 2:32-35, 5:26-30, 7:51-64, 8:22-26.  The examiner's allowance of claims amended to contain this language contradicts Huawei's assertion that the claimed techniques were "known in the art" (Mot. at 33) and suggests that it is implicitly adopting an incorrect claim interpretation.

Harris disputes Huawei's characterizations and implicit interpretations of identified claim terms (see, *e.g.*, discussion of '537 and '426 below), and its claim that the result is the same under any possible construction.  Further, the many fact disputes about conventionality suggest that "claim construction should be required."  *See Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013).  This case should proceed to discovery and claim construction, to resolve these disputes and inform the Court's future analysis as to patentability.

### II.   Huawei's Position: No Claim Construction is Needed to Evaluate Patentability Here

While Harris identifies a handful of claim terms it says need construction, in every instance, and in contravention of the Court's Standing Order, Harris fails to explain ***why*** or ***how*** construing the term would impact the § 101 analysis. *Cf. Network Architecture Innovations LLC v. CC Network Inc.*, No. 2:16-CV-00914-JRG, 2017 WL 1398276, at *4 (E.D. Tex. Apr. 18, 2017). (Gilstrap, J.) (finding claim construction unnecessary where plaintiff "failed to explain how claim construction might alter the § 101 analysis").

Moreover, here the patent specifications themselves admit that most of the elements Harris identifies were conventional. Claim construction is not needed to determine whether those elements provide an inventive concept because "the patents themselves are sufficient to answer the question." *Integrated Tech. Sys., Inc. v. First Internet Bank of Indiana*, No. 2:16-cv-00417-JRG-RSP, 2017 WL 631195, at *4 (E.D. Tex. Jan. 30, 2017), *report and recommendation adopted*, 2017 WL 617673 (E.D. Tex. Feb. 15, 2017), *aff'd*, 712 F. App'x 1007 (Fed. Cir. 2018) (rejecting plaintiff's assertion that claim construction was needed before ruling on patentability). Further, many of the terms are merely types of information that are acted upon (*e.g.*, sent or received) by conventional computer components, and construing them "would not change the basic character of the claimed subject matter." *Network*, 2017 WL 1398276, at *4.

Harris's position is merely an attempt to avoid a ruling now. But the Court should not delay adjudicating the patents' eligibility under § 101 because, under any plausible construction, the claims are ineligible. However, if the Court does believe construction of some terms would aid its § 101 analysis, Huawei respectfully submits that an early "mini-Markman" to address this case-dispositive motion would best serve judicial economy. *See Iris Connex v. Acer Am. Corp.*, Case No. 2:15–cv–1909, Dkt. No. 176 (E.D. Tex. May 25, 2016) (Gilstrap, J.).[1]

**'227 Patent.**  While Harris contends two sets of terms should be construed, it does not explain why or how such construction might alter the § 101 analysis—and for good reason. No plausible construction of the "security posture" terms could alter the specification's admission that establishing a network's "security posture" was conventional activity, and therefore not an inventive concept. *See, e.g.*, '227 at 2:31-43. Nor does Harris contend that a plausible construction would alter the fact that determining a "security posture" can be performed mentally or with pencil and paper. *See* Mot. 14. While Harris cites certain claimed "correlating" steps, it does not explain how they impart patentability, which is no surprise given that correlating data is neither non-abstract nor inventive. *See* Mot. 10, 13-14. And no plausible construction changes the fact that the claims recite only conventional components. *Id.* 15-16. Finally, Harris admits that a "vulnerability profile" is shown in Figure 8B, which merely depicts three levels of risk severity: high, medium, and low. No construction of that term is needed to determine that the claims are directed to an abstract idea and lack an inventive concept.

**'690 and '678 Patents.**  All of the patents' claims can be written as "monitoring transmissions to detect [X] and generating an intrusion alert based on [X]"—a quintessentially abstract idea. *See* Mot. 6. Harris asserts that only certain examples of "[X]"—the criterion monitored—need to be construed to evaluate patentability. Not so. No rational construction would alter the character of the claims as being directed to the abstract idea of monitoring communications to detect suspicious

---

[1] *See Uniloc USA, Inc. v. Inmagine Corp., LLC*, 2013 WL 3871360, at *5 (E.D. Tex. July 24, 2013) (undertaking "mini-Markman" to construe potentially case dispositive terms).

behavior. *Id.* 7.  Further, the terms merely specify what is being detected—not *how* to detect it—and regardless of the construction of the criterion that Harris says need construction, merely selecting the criterion for monitoring cannot impart inventiveness. *See* Mot. 10.  In addition, for the elements Harris contends need construction, the specification passages Harris cites either plainly explain them (*e.g.*, "collisions," *see* '690 at 8:41-53, 10:34-43), use the same plain language as the claims (*e.g.*, "detect failed attempts to authenticate MAC addresses," *see* '678 at 6:45-60), or admit they are conventional components of the 802.11 standard (*e.g.*, "NAV" value, *see* '678 at 6:61-7:8; "contention-free mode," *see id.* at 7:21-23).  No construction is needed to determine there is no inventive concept here.

**'986 Patent.**  This patent is directed to the abstract idea of adjusting a schedule based on acquired information.  *See* Mot. 17, 22-23.  The simple "time slots" terms that Harris says need construction are merely that which is being scheduled, and could not, under any plausible construction, alter the basic character of the claims as being directed to that abstract idea.  Further, no construction would alter the fact that "scheduling" either of those events can be done mentally or by pen. *Id.*, 22-23.  Moreover, those terms are readily understood:  time slots are assigned based on demand or in a "semi-permanent" manner regardless of demand, '986 at 5:16-30, 5:41-54, and correspond merely to practices of organizing human behavior.  *See* Mot. 23.  In addition, the patent plainly explains that "link utilization metrics" are a comparison of the amount of data sent and the amount of data left in queue, '986 at 4:34-41, another activity that can be performed mentally or with pen and paper, and that corresponds to common social practices.  *See* Mot. 23.  Finally, no plausible construction of these terms could alter the fact that the claims recite only conventional components (*e.g.*, transceiver, controller) for performing routine activities.  *Id.*, 27-29.

**'537 Patent.**  Harris identifies just one term it says "may" need construction, but makes no attempt to explain *why* construction is needed.  No rational construction of "unit status message" could alter the character of the claim as being directed to the abstract idea of sending, receiving, and monitoring information.  *See id.*, 23, 25-26.  Indeed, the "unit status message" *is* merely the information sent, received, and monitored in representative claim 30.  Moreover, no rational construction of that term could provide an inventive concept because transmitting and monitoring information are routine functions.  *See id.*, 28-29.  In addition, the specification admits that conventional networks transmitted such "status" of network nodes. '537 at 2:35-41; 3:59-4:2.  No construction is needed to confirm that that element contributes no inventive concept.

**'426 Patent.**  Again Harris identifies only one term it says "may" need construction without any explanation of *why* construction is needed to evaluate patentability.  As noted in Huawei's Motion, a wireless network having "electrically separate channels" is merely the field of use for the claims' abstract idea, and field of use limitations (regardless of how construed) do not impart patentability. Mot. 24-25.  Moreover, even Harris cites to a specification admission, '426 at 1:13-16, that conventional mobile ad hoc networks could use "one or more radio frequency channels"—confirming that such "electrically separate channels," regardless of how construed, could add no inventive concept to the claims.

**'572 Patent.**  The patent expressly admits that "add[ing] a plurality of encrypting bits," the precise term that Harris states "may" need construction, was a technique known in the art, *see* Mot. 30, 33.  It therefore cannot provide the missing inventive concept under any rational construction.  Moreover, Harris's reliance on the Examiner's allowance of the claims as a bar to adjudication at the pleading stage is contrary to law, as that rationale would apply to any issued patent claim.